**In re Dorsey EVANS, Respondent, A Member of the Bar of the District of Columbia Court of Appeals.**

**No. 89–953.**

District of Columbia Court of Appeals.

Argued April 16, 1990.
Decided July 24, 1990.

---

Dorsey Evans, pro se.

Ross T. Dicker, Asst. Bar Counsel, with whom Thomas E. Flynn, Bar Counsel, was on the brief, for Bar Counsel.

Before ROGERS, Chief Judge, FARRELL, Associate Judge, and REILLY, Senior Judge.

PER CURIAM:

Upon its determination that respondent, an attorney, took funds of an estate without authority and so engaged in misappropriation, in violation of DR 9–103(A), the Board on Professional Responsibility (the Board) has recommended that respondent be suspended from the practice of law for six months. The Board set forth its findings, conclusions, and recommendation in a lucid and thorough report which we adopt and reproduce as an appendix hereto.[1] We accept the Board's findings of fact, which in essence sustained as supported by substantial evidence detailed findings made by a Hearing Committee. We also accept the Board's conclusions, which differ in one critical respect from the Committee's.

The Committee found that respondent had relied upon a "side agreement" with the heirs to an estate he was administering to justify a deduction of attorney's fees over and above those authorized by statute. The Committee found that respondent reasonably *believed* that both heirs had consented to the additional fee, and hence concluded that—although in fact one heir had not consented—respondent had not engaged in conduct involving dishonesty, within the meaning of DR 1–102(A)(4). The Board, over the dissent of one member, found substantial evidence in the record to support the Committee's finding that respondent had an objectively reasonable, albeit erroneous, belief that his actions were

proper, and therefore agreed with the conclusion of no dishonesty.

The Board rejected, however, the Committee's conclusion that respondent had not engaged in misappropriation prohibited by DR 9–103(A). Citing and confirming the Committee's finding "that Respondent had *not* effected a valid 'side agreement' that actually permitted him to take the additional fee," the Board concluded:

When Respondent acted on his erroneous belief that Ms. Byrd [the non-consenting heir] had authorized the extra fee, he acted at his peril. When Respondent took Ms. Byrd's share of the extra attorney fee, he misappropriated her funds.

This conclusion followed from the Board's recognition that "improper intent is not an element to be considered in determining whether there has been a misappropriation.... [R]ather, it is essentially a per se offense." *In re Harrison*, 461 A.2d 1034, 1036 (D.C.1983). *See also, In re Hessler*, 549 A.2d 700 (D.C.1988).

■ Just as the Board, when reviewing the findings of a Hearing Committee, "shall employ a 'substantial evidence on the record as a whole' test," Board Rules § 13.6, so this court must accept the Board's findings of fact so long as they are supported by substantial evidence of record. *In re Gilchrist*, 488 A.2d 1354, 1357 (D.C.1985); D.C.Bar R. XI, § 9(g) (1989). Applying this deferential standard of review, we credit the finding of the Hearing Committee—accepted by the Board—that respondent reasonably but mistakenly believed that his actions were proper and so did not engage in conduct involving dishonesty. Contrary to respondent's contention, however, in rejecting the Committee's conclusion that he did not engage in misappropriation, the Board did not supplant any factual finding rendered by the Committee; rather, the Board's conclusion was necessitated by the Committee's own finding that respondent had not in fact received the consent of the heirs, at least

---

1. We also print the opinion of the dissenting member, Mr. Fox, since the Board's opinion refers to it.

of Ms. Byrd. We therefore adopt the Board's conclusion that respondent misappropriated funds in violation of DR 9-103(A).

■ We likewise adopt the Board's recommendation of a six-month suspension, bearing in mind our obligation to do so unless that course "would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C.Bar R. XI, § 9(g). We reject respondent's argument that his conduct at worst was a "technical violation," for the reasons stated by the Board in its recommendation. In mitigation of the conduct, respondent essentially cites only the same absence of dishonesty which caused the Board to find a lesser violation, and what he terms his exemplary conduct both before and since the events in question.[2] On the record of this case, and in light of the precedents discussed by the Board, we conclude that a lesser sanction would be inappropriate and that a greater sanction is not required.

Accordingly, we order that respondent, Dorsey Evans, be suspended from the practice of law in the District of Columbia for a period of six months, effective thirty days from the date of this order.

*So ordered.*

## DISTRICT OF COLUMBIA COURT OF APPEALS BOARD ON PROFESSIONAL RESPONSIBILITY

Docket No. 77-86

IN THE MATTER OF: DORSEY EVANS, Esquire, RESPONDENT.

## REPORT AND RECOMMENDATION OF THE BOARD

Respondent was charged with a cluster of Code violations stemming from payment to himself of an allegedly unauthorized attorney fee out of an estate he was han-

dling.[1] An evidentiary hearing on these charges was held on January 5 and February 3, 1988 before Hearing Committee No. 9, whose members were attorneys Linda J. Ravdin (Chairperson) and Lynn Suzanne Spradley, and lay member Alice L. Norris. The Hearing Committee filed its Report with findings, conclusions, and recommendations on August 25, 1988.

In that Report all three members of the Committee agreed that Respondent had violated DR 9-103(A) in that he had misappropriated funds from the estate. Two members felt that the misappropriation had been unintentional, so they found no violation of DR 1-102(A)(4). These members (whom we will refer to as "the majority") recommended the sanction of public reprimand. The Chairperson dissented because she found that the misappropriation had been intentional and dishonest. She recommended a six-month suspension and restitution as appropriate sanctions.

Bar Counsel filed exceptions to the Hearing Committee Report and briefs were submitted. Oral argument was heard by the Board on October 20, 1988.

During the course of its post-argument deliberations, the Board decided that, because of apparent inconsistencies, certain points in the majority's opinion required clarification. On February 14, 1989, the Board remanded the case to the Hearing Committee for a supplemental report directed to three specific issues. A copy of the Board's Remand Order is appended to this Report as Exhibit A.

The Hearing Committee filed a Response to the Remand Order on April 4, 1989, advising that the majority had revised their earlier opinion, amended some of their prior fact findings, and "significantly changed the conclusions originally offered." The majority now concluded that Bar Counsel had proven no disciplinary violations. A

---

2. Respondent concedes that he had received an informal admonition in an earlier disciplinary matter, but insists that there he was held indirectly responsible for the conduct of another lawyer associated with his firm. Bar Counsel disputes this characterization.

1. Bar Counsel charged violations of DR 9-103(A) (misappropriation); DR 1-102(A)(4) (dishonesty); DR 1-102(A)(5) (conduct prejudicial to the administration of justice); and DR 2-106(A) (charging excessive fees)—all arising from the same estate matter.

copy of the Response to the Remand Order is appended as Exhibit B.

The Chairperson, who had dissented from the original Hearing Committee Report, adhered to her previous position. Bar Counsel filed no exceptions to the revised majority findings and conclusions, and the matter is now before the Board for review.

After careful consideration of the record, the briefs and arguments of counsel, precedents established in comparable cases, and the revised Hearing Committee report, the Board agrees with the conclusion originally reached by the Hearing Committee that Respondent misappropriated client funds. We also agree with the majority's conclusion that Bar Counsel has not proven that the misappropriation was dishonest. The Board recommends suspension for six months as the appropriate sanction.

## FINDINGS OF FACT

The Board adopts the revised Findings of Fact of the Hearing Committee majority, although some of these have been rephrased and expanded for purposes of clarity. The Board also makes additional findings of its own. The facts in the record upon which we base our conclusions are as follows:

1. Respondent, Dorsey Evans, is an attorney who was admitted to the practice of law in the District of Columbia in 1960. He has extensive experience in probate matters. Transcript of 2/3/88 (hereinafter "Tr. II"), p. 149;[2] Respondent's Brief of 10/17/88, p. 1.

2. On November 23, 1978, Carl W. Smith died intestate in the District of Columbia. BX 18(a). He was survived by two sisters: Lucille Byrd, who resided in Dayton, Ohio, and Pauline Carter, who re-

2. The transcript of the 1/5/88 hearing session will be referred to as "Tr. I"; Bar Counsel exhibits will be referenced "BX."

3. Respondent's petition referred to a checking account balance in the amount of *$28,115.00* (BX 18(b)), but this was never listed in any of the subsequent probate filings. This discrepancy was not discussed at the hearing, and was presumably explained to the satisfaction of the

sided in the District of Columbia. Tr. II, pp. 9–10, 41–42.

3. On April 4, 1979, Respondent filed a Petition for Letters of Administration on behalf of Cleopatra W.L. McLean, a stepdaughter of Mr. Smith. Letters of Administration were granted to Ms. McLean by the Superior Court on June 6, 1979. BX 18, 18(a), 18(b), 18(c); Tr. II, pp. 10, 11, 43.

4. On or about June 12, 1979, Respondent deposited the sum of $2,843.75 (the proceeds of an insurance policy) into a bank account that was established for the estate. BX 19, 26(c).

5. On October 9, 1979, Ms. McLean died. On September 10, 1980, Respondent filed a Petition for Letters of Administration, DBN, on his own behalf (as a creditor of the estate). This Petition was granted on November 5, 1981, and Letters were issued on April 2, 1982. BX 18, 18(b), 18(c).[3] Respondent thus became the personal representative of the estate as well as its counsel.

6. On April 7, 1982, Respondent filed the "First & Final (DBN) Account" for the estate with the Probate Division. In that document, Respondent listed assets of $2,843.75 and, as "Administrative Expenses," the amount of $284.37 (ten percent of the estate assets) for: Dorsey Evans, Attorney Fees." The "Balance for Distribution" on the Account was stated to be $389.73 to Lucille Byrd and a like sum to Pauline Carter. The other estate assets were accounted for as disbursements for funeral expenses ($1,595.93), bond premium, notice publication expenses, and filing fees. BX 19. This filing made no mention of the $600.00 attorney fee figure that had been listed in Respondent's Petition. See footnote 3 (*supra*).

Probate Division. *See* handwritten notes on BX 21(a). Respondent's petition also listed as a debt of the estate:

Dorsey Evans, Esq.
Atty Fees
for legal services rendered in handling the estate ...............$600.00

There is no indication that copies of this petition were sent to the heirs.

7. On April 14, 1982, Respondent addressed a letter to Ms. Carter (BX 20(a)), informing her that he had "filed the final accounting in the Carl Smith Estate." The letter went on to inform Ms. Carter that a Rule 14 consent form was required to be filed with the Court to reflect "that you and Lucille Byrd are aware that the final accounting is being filed." The letter went on to say:

> If you will sign where the X is your name Pauline Carter and if you feel that it's Okay, you may also sign Lucille Byrd's name. Forward it back to this office and I will get it filed so that we can get this matter concluded.

Although the letter to Ms. Carter enclosed the Rule 14 consent form, it did not enclose a copy of the Final Account itself. Tr. I, pp. 112–116; BX 20(a). The other heir, Ms. Byrd, received neither a copy of the letter, a consent form, nor a copy of the Final Account.

8. On April 26, 1982, Respondent filed an executed consent form with the Probate Division. The executed form was dated April 19, 1982, and it was signed "Pauline B. Carter" and "Lucille Byrd/P.B.C." BX 20(b). Pauline Carter had signed Lucille Byrd's name to the consent form without informing Ms. Byrd that she was doing so. Tr. II, pp. 14, 44.

9. On July 26, 1982, Respondent filed a "Restated First and Final (DBN) Account" with the Probate Division. BX 23. This was apparently required because funeral expenses of the estate, previously listed as $1,595.93, had to be reduced to $1,000. As a result of this change, the amount to be distributed to each heir was changed to

$687.69. On the Restated Account, under the heading "Administrative Expenses," the following entry appeared: "Dorsey Evans, Attorney Fees (commission 10%) ... $284.37." The heirs were not sent a copy of this filing.[4]

10. The Restated Account was approved by the Court on February 23, 1983. BX 24(a).

11. On April 6, 1983, Respondent wrote to Ms. Carter and Ms. Byrd stating that "the first and final accounting on the above estate has been approved." His letter went on to furnish a calculation as follows:

| | |
|---|---|
| Total Amount Received: | $1,269.16 |
| Attorney Fees: | $ 400.00 |
| For Lucille Byrd: | $ 434.58 |
| For Pauline Carter: | $ 434.58 |

With her copy of this letter each heir received a check in the stated amount of $434.58. BX 5(a), 5(b). This letter was the first communication to the heirs that mentioned an amount of compensation for Respondent and the precise amounts that the heirs were to receive. There was no mention that Respondent would be paid a ten percent commission over and above the $400 attorney fee, nor did Respondent inform the heirs that the Court had approved different figures from those set forth in his letter.

12. The amounts listed in Respondent's letter of April 6, 1983 to the heirs differed from those shown in the approved Restated Account in the following respects: instead of receiving $687.69 as the Court had approved, each heir received only $434.58; compensation to Respondent, which had been reported to the Court at $284.37, went to $400 in the letter.[5]

---

**4.** Respondent was apparently not required to file new consent forms with respect to the Restated Account because the heirs' shares were increased. Tr. I, p. 130.

**5.** The Board was not able to reconcile the figures in Respondent's letter of April 6 with the figures shown in the Restated Account even after giving effect to the change in Respondent's compensation. Increasing Respondent's com-

pensation from $284.37 to $400.00 should have reduced the balance to be distributed to the heirs by $115.63—57.82 for one heir and $57.81 for the other. However, each heir actually received $253.11 less than was shown on the Restated Account ($434.58 as compared with $687.69). Since both heirs together received $506.22 ($253.11 × 2) less than the Restated Account showed, and since the increase in attorney fees accounted for only $115.63 of this

13. On April 12, 1983, Respondent drew a check to himself on the estate account in the amount of $400 for "Attorney fee." On June 9, 1983, Respondent drew another check to himself, in the amount of $284.37, on the same account. This check was notated "Commission—1st and Final Account." BX 27.

14. Respondent was required by the Probate Division rules to file receipts with the Court showing that he had distributed to each heir the amount shown on the approved account, *i.e.,* $687.69. Tr. I, pp. 77–78, 104; Tr. II, p. 94; BX 24(a). Despite several official requests, these were not filed. On July 20, 1983, the Probate Division sent a formal notice to Respondent stating: "Please file the receipts due in your account, approved by the Court February, 1983." BX 24(b). This notice went on to warn:

> An Order to Show Cause shall issue against you directing your appearance before the Court to explain your apparent delinquency unless your letter of explanation for failure to file the above-described receipts is submitted within twenty days.[6]

15. Respondent did not file the receipts. Tr. I, pp. 42, 81–82; Tr. II, p. 141. On February 27, 1984, the Register of Wills notified the Court of this failure (Tr. I, p. 81; BX 25(a)) and, on the same day, the Court set a Summary Hearing in the matter. Tr. I, p. 82; BX 25(b). Respondent did not appear at the Summary Hearing. By Order entered on April 20, 1984, he was removed as Administrator and a successor was appointed. Tr. I; p. 85; BX 28, Tr. I, p. 84; BX 26(a).[7]

16. At the disciplinary hearing, Respondent testified that he had telephoned Ms. Carter sometime in 1982 and told her that the payment of a commission of $284 would be approved, but that "additional attorney's fees would have to be paid because the statutory fee would not fully compensate him for his work on the case since 1978." He also testified that he had asked Ms. Carter during that conversation to approve the payment of an additional attorney fee. According to Respondent, Ms. Carter agreed that an additional attorney fee could be taken. Respondent made no notes and sent no letter memoralizing this conversation. Tr. II, pp. 118–120; BX 2.

17. Ms. Carter testified that she could not remember any conversation with Respondent about attorney fees. Tr. II, pp. 21–25. The other heir, Ms. Byrd, testified that she had never given Respondent permission to take an additional fee, nor had she authorized her sister to give Respondent such permission. Tr. II, p. 46.

18. When they wrote their original findings and conclusions, the majority credited Ms. Carter's testimony and determined that "there was no agreement between Respondent and Ms. Carter" respecting the pay-

---

difference, the remainder, $390.59, is not accounted for. The fact that Respondent charged a commission of $284.37 in addition to the attorney fee of $400 does not totally account for the difference. We are thus at a loss to understand the majority's conclusion (Revised Report, p. 11) that Respondent's letter is consistent with the Account if the additional $400 fee was authorized.

**6.** Respondent testified that, though he knew that receipts were required, he did not expect that the Register of Wills office would bother to call for the receipts in such a small estate. Tr. II, pp. 143–145.

**7.** Respondent tried to explain his failure to appear as follows: "... when I received the notice of summary hearing, I gave it to my assistant to find the receipts and handle the matter and in my rush to leave the country, the hearing date somehow slipped my current awareness and when I returned I had been removed and the new administrator had been appointed. * * * Now I recall that in the back of my mind on this case it was my thinking that once this matter came to the attention of the Register of Wills or someone with authority they'd probably say, well, okay, there is no receipt but there is no complaint so why go through the procedure of removing the administrator and appointing another one to get a receipt. So in the back of my mind, without having a clear, concise position, I am thinking hey as soon as they learn about what happened in this case, that will be the end of it. I was very much surprised when I returned and learned that not only had it not been handled by my assistant but that in fact the Court had removed me and appointed another administrator." Tr. II, pp. 142–144. See also BX 26(c). Respondent took no subsequent action to have the Court reconsider his removal or to file the receipts.

ment of a fee in addition to the ten percent commission. However, when they reconsidered the same evidence after the remand,[8] the majority found that it was "quite possible that Ms. Carter gave assent to the additional fee without understanding the situation and thus not remembering it in context" (Revised Report, pp. 17–18). On this basis, the majority now decided to credit Respondent's version of the conversation. However, the majority stayed with their earlier finding "that Respondent did not have a separate agreement with *Ms. Byrd* for any additional fee." *Id.* p. 16.

19. The Successor Administrator, James Greene, Esq., ultimately obtained receipts from Ms. Byrd and Ms. Carter showing that they had each been paid $434.58, rather than the $687.69 shown in the approved Account. BX 27. On August 13, 1984, after learning that Respondent had paid himself a $400 attorney fee in addition to the ten percent commission, Greene wrote to Respondent as follows:

If you can produce a written consent from each of these ladies, please do so, in proper form to be filed. Unless those are produced within 20 days, or you can demonstrate in some other fashion that you were authorized or entitled to the sum of $400.00 in excess of commissions I must insist, as Successor Administrator, that you reimburse the estate in the sum of $400.00. [BX 29(b)]

Respondent wrote back on August 23, 1984, stating that: "... the $400 fee paid to my offices for services rendered did not come in the purview of the estate of Carl W. Smith." Respondent's letter went on to say:

You will note that the fee was paid after the accounting had been approved by the court. Therefore there was no court order involved in this or none needed. These were funds that then were totally outside the jurisdiction of the probate court and, therefore, are not funds that should be reimbursed to the estate or to you as Successor Administrator because they were funds that were disbursed after the accounting had been approved.

I know of no law or rule of law that would suggest that parties are not free to make arrangements with attorneys for services rendered and pay them from their own personal funds. If you know of any such law I would be pleased if you would bring it to my attention. However, since I know of no such law, I know of no reason why Ms. Bryd [*sic*] or Ms. Carter were not free to pay attorney's fees *with their own funds* after it had been approved by the Court, without additional court orders.

I did not inquire of them as to what they did with the balance of the funds I sent them, as I'm sure that this was not within the purview of the court either. [BX 30] [Emphasis added].

20. Mr. Greene then corresponded with both heirs to ascertain what arrangements they had made with Respondent for the payment of an additional attorney fee. Tr. I, pp. 44–45; BX 31, 32. By letter dated October 25, 1984, Ms. Carter responded that the subject of an additional attorney fee had not come up at any time. BX 33(a). In a letter dated December 18, 1984, Ms. Byrd responded that "I did not agree to or have any idea that I would be expected to pay attn. fees." BX 3(c).

21. Based on what the heirs had told him, Mr. Greene instituted a Small Claims action on behalf of the estate against Respondent seeking recovery of the $400 attorney fee. Tr. I, p. 49; BX 34(a). That claim was ultimately settled before trial by Respondent paying $250 of the $400. From this recovery, after deduction of expenses, each heir received $70. Tr. I, p. 51, BX 36.

22. The Hearing Committee heard conflicting expert testimony as to whether compensation for D.C. fiduciaries was strictly limited to a ten percent commission, or whether so-called "side agreements" could be worked out, at the time of these probate proceedings. The Hearing Committee credited Respondent's expert, who opined that a fiduciary performing estate work could, under certain circumstances,

---

**8.** The Hearing Committee did not hold evidentiary hearings after the Board's Remand Order.

effect a "side agreement" to obtain extra compensation. This could be done if the fiduciary asked all heirs specifically to authorize the additional compensation and told them that the fiduciary was being awarded one amount by the Court, but was seeking additional compensation. The fiduciary would have to inform the heirs that payment of the additional amount was entirely discretionary. In addition, although the fiduciary might take the agreed extra compensation from estate funds before the heirs got their shares, the heirs would have to sign receipts as if they had received the approved sums and then paid the fee. Tr. II, pp. 82–83, 94, 97, 105–106.

23. After crediting Respondent's version of the 1982 telephone conversation with Ms. Carter following the remand, the majority went on to make these specific fact findings:

> Respondent believed that the law permitted separate agreements with heirs, he believed that his telephone conversation with Ms. Carter resulted in an agreement for both heirs to the additional $400.00 fee, he believed that after the Restated Account was filed and approved it was proper for him to distribute $434.58 to each heir, and, he believed that he could pay himself the 10% commission as well as the $400.00 attorney fee. Bar Counsel has not shown by clear and convincing evidence that when Respondent harbored these beliefs there were any facts or circumstances that would have made such beliefs unfounded even to Respondent. (Revised Report, p. 12).

Based on these findings as to the Respondent's state of mind, the Hearing Committee majority concluded that no violations had been proven.

24. The majority did, however, find that:

> ... although the Respondent considered the additional fee had been agreed to by Ms. Carter, there was no record of a side agreement in which the Respondent obtained specific authority from the heirs for the additional fee. [Ibid]

This Finding apparently followed from the majority's determination that Ms. Byrd had not consented to any "side agreement" as to attorney fees. Revised Report, p. 14. The majority also pointed out that "Respondent was lax and casual in his handling of this matter." See Response to Remand Order (Exhibit B hereto), paras. 2 and 3.

## CONCLUSIONS

### Dishonest Misappropriation

If we were considering this record de novo, we might be tempted to conclude, as does our dissenting Member, that Respondent dishonestly took the extra attorney fee from the estate. Aside from Respondent's ipse dixit testimony that he had obtained Ms. Carter's permission to take the additional fee during the 1982 telephone conversation, there was scant evidence either that such permission had actually been granted or that Respondent really contemporaneously believed he had been given permission.

Indeed, when viewed in hindsight, Respondent's actions respecting the extra fee could be seen as having been deliberately calculated to make sure the heirs and the Court would not know the real amount of his compensation. The heirs did not receive copies of documents that Respondent filed with the Court (including the final accounting), so they could not see that Respondent was taking an attorney fee that had not been judicially approved, or that Respondent was taking both an attorney fee and a ten percent commission. Insofar as the Court was concerned, because Respondent did not file receipts, the Probate Division was also kept in the dark as to the amount of Respondent's compensation.[9]

---

9. In this regard, the majority was generous in its observation that "Respondent was nothing but candid and forthcoming in his letters to Mr. Greene ... about the $400.00 attorney fee." Revised Report, p. 11. For example, Respondent's August 23, 1984 letter (quoted in Finding No. 19, supra) was not particularly candid. When Greene asked Respondent to justify taking the extra attorney fee, Respondent did not mention the 1982 telephone conversation. More significantly, he artfully attempted to depict the transaction as one where the heirs had agreed to pay

Nevertheless, under the Board's Rules (Rule 13(6)), facts found by the Hearing Committee are binding upon us if they are supported by substantial evidence in the record as a whole. *In re Gilchrist,* 488 A.2d 1354, 1357 (D.C.App.1985). "Substantial evidence" has been defined as "more than a mere scintilla ... such relevant evidence as a reasonable mind might accept as adequate...." *Citizens Association of Georgetown v. District of Columbia Zoning Commission,* 402 A.2d 36, 41 (D.C. App.1979). Notwithstanding that contrary inferences can be drawn from this record, we feel it contains sufficient substantial evidence to support the majority's view that Respondent did not act dishonestly when he took the the extra fee.

The majority found that "side agreements" to pay extra fees were allowable. The majority's evidentiary finding that Respondent had, in fact, conferred with Ms. Carter in 1982 about the additional fee and obtained her consent at that time adequately supports the subsequent finding that Respondent really believed his actions were proper, at least as to this heir. See Response to Remand Order, para. 1. As to the other heir, the majority's evidentiary finding that Ms. Carter had previously signed Ms. Byrd's name to the Rule 14 consent form (Finding No. 8, *supra*) can be said adequately to support the subsequent finding that Respondent had a basis to believe that the permission he thought he had obtained from Ms. Carter covered Ms. Byrd as well. Response to Remand Order, para 2. These key factual findings as to Respondent's state of mind are adequate to support the majority's ultimate conclusion that there was no dishonesty because of a good faith belief in the propriety of the actions involved.

Our dissenting Member takes issue with this conclusion by the Hearing Committee majority. He urges that, to avoid a finding of dishonesty, Respondent had to have an "objectively reasonable basis" for the belief that his actions were proper. But the majority's opinion does not hold that a mere *subjective* belief by Respondent in the propriety of his actions would have been sufficient to avoid a finding of dishonesty. Indeed, we recently held in another context that an *objective* standard is applicable. *See, In Re Rosen,* Docket No. 187–85, BPR Report 6/28/88 (pending D.C.C. A.). The majority only found that, as a matter of proof, Bar Counsel had failed to meet his burden of showing "that when Respondent harbored these beliefs there were any facts or circumstances that would have made such beliefs unfounded even to Respondent." In other words, Bar Counsel had not proven lack of an "objective reasonable basis" for Respondents' beliefs. It must be noted that Bar Counsel has not filed exceptions to the majority's findings.[10]

As we explain below, the Board has concluded that Respondent's belief that he had a valid "side agreement" with the heirs was actually erroneous. However, it is well established that an honest, though erroneous, belief as to propriety bars a conclusion of dishonest action because it precludes a finding of "improper intent." *In re Hessler,* 549 A.2d 700 (D.C.App.1988). *See also In re Hines,* 482 A.2d 378 (D.C. App.1984); *In re Buckley,* 535 A.2d 863 (D.C.App.1987). Therefore, we adopt the Hearing Committee majority's conclusion that Bar Counsel had not proven Respondent guilty of dishonest misappropriation under DR 1–102(A)(4).

him additional attorney's fees *after* they received their distributive shares from the estate. Respondent did not reveal the key fact that the fee had been taken from estate funds. Respondent's own expert testified that valid "side agreements" require that the heirs either pay the fee from their own funds or sign formal receipts as if they had paid the fee. Tr. II, p. 102.

10. By upholding the majority's conclusions, we do not intend to condone Respondent's handling of this estate. Aside from not disclosing either

to the heirs or to the Court the amount of compensation he was taking, Respondent may have specifically violated the Probate Rules by failing to furnish Ms. Carter with a copy of the account when he sent her the Rule 14 Consent Form. Thus, totally aside from any issue as to "dishonesty," Respondent may have committed a "misrepresentation" under DR 1–102(A)(4) by failing to disclose material facts. However, Respondent was not charged with this specific offense.

*Misappropriation*

Notwithstanding their refusal to find dishonesty respecting Respondent's taking of the additional fee, the Hearing Committee majority did find, in fact, that Respondent had *not* effected a valid "side agreement" that actually permitted him to take the additional fee. At the very least, Respondent achieved no such agreement with Ms. Byrd, with whom he never discussed the subject.

Despite what Respondent might have *thought* about Ms. Carter's authority to bind her sister, no such authority existed. Ms. Carter's signing of Ms. Byrd's name to the consent form—an act that was done at Respondent's own suggestion—was not a manifestation of real or apparent authority by Ms. Carter to bind her sister to pay the extra attorney fee to Respondent absent subsequent ratification—which did not occur. As an experienced practitioner, Respondent is charged with knowledge of agency law. When Respondent acted on his erroneous belief that Ms. Byrd had authorized the extra fee, he acted at his peril. When Respondent took Ms. Byrd's share of the extra attorney fee, he misappropriated her funds.

Respondent also misappropriated funds from *Ms. Carter* by taking the extra fee because no valid "side agreement" was effected with her. For there to be such an agreement, the extra fee had to be paid by her, rather than out of estate funds. If, for administrative ease, the extra attorney fee was taken from her share before distribution to her, it was still necessary for Ms. Carter to acknowledge receipt of the amount shown on the approved account. This did not occur here. Furthermore, Respondent did not satisfy other prerequisites for a valid "side agreement" in that he had not informed Ms. Carter that she could decline to pay the additional fee if she chose to do so.[11]

Once it has been found that funds were taken without authority, the conclusion that a misappropriation has taken place in violation of DR 9–103(A) is unavoidable under *In re Harrison,* 461 A.2d 1034 (D.C. App.1983). There the Court defined "misappropriation" as:

> Any unauthorized use of clients' funds entrusted to him, including not only stealing but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom. [461 A.2d at 1036.]

The Court in *Harrison* went on to state that "improper intent is not an element to be considered in determining whether there has been a misappropriation ... rather, it is essentially a *per se* offense. *Ibid.* This principle was reiterated and confirmed in the Court's recent opinion in *In re Hessler,* 549 A.2d 700, 701, n. 3 (D.C.1988).[12]

*Recommended Sanction*

Because we have concluded that Respondent violated DR 9–103(A), it becomes necessary for the Board to review the traditional factors that must be weighed in determining appropriate discipline. These include: applicable judicial and Board precedents; the seriousness of the conduct; the prejudice, if any, to the client; whether there were violations of companion provi-

---

11. The Hearing Committee majority apparently found no misappropriation simply because it found that the additional fee was not "unauthorized" on the basis of the absence of prior Court approval. Revised Report, p. 14. In other words, the majority acted as if, once the Court approval hurdle were overcome, Respondent had proven a valid "side agreement." However, approval by the *heirs* was also required if a misappropriation ·finding was to be avoided. The majority recognized this, but cleared Respondent of the misappropriation charge even though they found that Ms. Byrd had not given her approval. The majority's reasoning is hard to follow, as best.

12. In view of our conclusion, that Respondent violated DR 9–103(A) by misappropriating funds, it is not necessary for us to decide whether taking the extra fee may also have violated DR 2–106 in that Respondent charged or collected an illegal or clearly excessive fee. *See Attorney Grievance Commission v. Abb,* 306 Md. 636, 510 A.2d 1087, 1090–1091 (1986); *In re Hudock,* 544 A.2d 707 (D.C.App.1988). We thus leave open the question whether a good-faith belief that is sufficient to avoid a finding of dishonest misappropriation in connection with the taking of a fee is also sufficient to avoid a finding of taking an illegal or excessive fee where fees are specifically limited by statute.

sions of the Code of Professional Responsibility; whether the conduct involved dishonesty and/or misrepresentation; whether the attorney had been subjected to prior discipline; the attorney's attitude toward the underlying matters; and any other circumstances in mitigation or aggravation.

In view of the Hearing Committee majority's determination as to Respondent's state of mind, which the Board has accepted, it is not appropriate for us to consider "dishonesty and/or misrepresentation" as aggravating factors here. Nevertheless, even if we considered Respondent's innocent state of mind to be a mitigating factor, we feel that a suspension for six months is warranted in this case.

Although the amount of money involved in this violation is small, even if both heirs' shares are considered, the funds were taken while Respondent was serving in a fiduciary capacity. In that role, he was charged with the highest responsibility to safeguard the assets of the estate and the interests of the heirs. This was particularly important in this case, where the heirs were unsophisticated and vulnerable. Respondent was more than "lax and casual" in his handling of this estate; he appeared insensitive to his fiduciary responsibilities and he violated those responsibilities.

Respondent filed accounts with the Court that were not accurate; he failed to file required documents; and he did not respond to judicial orders that he appear in Court. He stubbornly adhered to the erroneous position that his fee was authorized when he should have considered that his position was untenable. By forcing the Successor Administrator to file formal legal proceedings against him, Respondent caused the estate to incur unnecessary additional costs, and he caused delay and prejudice to the heirs.

In recommending the sanction of a six-month suspension, we have taken into account such precedents as *In re O'Bryant*, 425 A.2d 1313 (D.C.App.1981). The lawyer there was charged with several violations

stemming from failure to repay to the client funds that the client had left with him for possible use in posting a bond. The lawyer asserted that the client had orally agreed that he could use the funds to pay his fees. The client vigorously denied that she authorized this use of the money. The members of the Hearing Committee disagreed among themselves as to which testimony to believe.

One member found the client's testimony to be less than candid and concluded that Bar Counsel had failed to prove that the client had not consented that the attorney fee could be taken. However, the majority of the Hearing Committee determined that the lawyer's explanation was not convincing, and that the client's testimony that the fee had not been authorized was persuasive. The majority recommended the sanction of a one-month suspension.

The Board in *O'Bryant* accepted the Committee majority's assessment of the witnesses' credibility, but rejected its recommended sanction as "wholly inadequate." The Board recommended a six-month suspension as the minimum warranted, and the Court agreed with this recommendation. In doing so, the Court relied on *In re Leventhal*, No. S–49–77 (D.C. App. 9/22/77), a reciprocal discipline case involving an illegal or excessive fee, where a six-month suspension was also imposed.[13]

Although the Board in *O'Bryant* had found dishonesty, an element not found in this case, *O'Bryant* did not involve an attorney acting in a fiduciary capacity who took a fee in excess of a clear statutory limitation. We think the six-month suspension upheld in *O'Bryant* is consistent with the similar suspension recommended here.

In its recent *Hessler* case (*supra*), the Court suspended the attorney for six months. *Hessler* involved unintentional misappropriation as well as commingling. A majority of the Board had recommended a one-year suspension, while the other Board members argued for more stringent sanctions. Although the Court in *Hessler*

---

**13.** The Board in *O'Bryant* took into consideration the attorney's prior disciplinary record, an informal admonition. The Respondent in our case also has a prior disciplinary record involving an informal admonition.

viewed the commingling as a serious violation, the Court left no doubt that it viewed the misappropriation aspect, even if it stood alone, to be a very serious offense. Indeed, Judge Steadman observed that: "In the abstract, such an action might well warrant a one-year suspension." 549 A.2d at 703.

There were numerous mitigating factors in *Hessler* that induced the Court to impose only a six-month suspension. But other than Respondent's good-faith belief in the propriety of his actions, there are no comparable mitigating factors here.[14] Accordingly, we feel that when the commingling element in *Hessler* is balanced against the mitigating factors present in that case, the six-month suspension imposed in *Hessler* calls for a similar suspension in the present case.

Accordingly, we recommend that Respondent be suspended for six months for misappropriating client funds without dishonest intent.

Dated this 28th day of July, 1989.

BOARD ON PROFESSIONAL

RESPONSIBILITY

By: /s/ Charles R. Donnenfeld
CHARLES R. DONNENFELD

All members concur in this opinion, with the exception of Member Fox, who files a dissenting opinion, and Member Carter, who did not participate.

## ORDER REMANDING CASE FOR SUPPLEMENTAL REPORT BY HEARING COMMITTEE

This matter came before the Board on Professional Responsibility on exceptions filed to the Findings, Conclusions, and Recommendations of Hearing Committee No. 9, dated August 25, 1988, and, upon due consideration, the Board remands this case to the Hearing Committee for the entry of further Findings, Conclusions, and/or Rec-

ommendations to clarify the following points:

(1) The Hearing Committee majority appears to have found as fact that Respondent had a good faith belief, when he took the attorney fee in the amount of $400, that he was acting pursuant to an agreement with the Estate heirs. Presumably, such belief was based on the 1982 telephone conversation between Respondent and Ms. Carter, about which Respondent testified. Yet the Hearing Committee discredited the Respondent's testimony as to that telephone conversation, crediting Ms. Carter's opposing testimony that she had not authorized payment of attorney fees to Respondent at any time. Because the Hearing Committee did not believe Respondent's version of the telephone conversation with Ms. Carter, on what basis did the Hearing Committee nonetheless find that Respondent had a good faith belief that he had obtained Ms. Carter's permission to take the additional fees?

(2) Even if the Hearing Committee had a basis to find that Respondent had a good faith belief that he had obtained Ms. Carter's consent, notwithstanding its discrediting of Respondent's testimony as to the 1982 telephone conversation, on what basis did the Committee go on to find that Respondent had a good faith belief that Ms. Carter acted for, or had authority to act for, Ms. Byrd with respect to the matter of additional fees?

(3) Even if the Hearing Committee had a basis to find that Respondent had a good faith belief that he had the consent of both heirs to take the attorney fees, notwithstanding its discrediting of Respondent's testimony as to the 1982 telephone conversation, on what basis did the Hearing Committee go on to find that Respondent had a good faith belief that he had met the other prerequisites to a valid "separate agreement" for payment of additional fees permissible under the probate rules then in effect.

**14.** Although Respondent at one stage urged before the Board that the passage of time since the alleged violations occurred should be treated as a mitigating factor, this position was abandoned

when Bar Counsel pointed out that most of the delay was attributable to Respondent's own actions. See Respondent's Brief of 12/1/88, p. 1.

The Hearing Committee should file a response to this Order within thirty days. The Board does not contemplate that further evidentiary hearings will be held, but the Hearing Committee may, in its discretion, allow the parties promptly to file written memoranda to assist its deliberations.

FOR THE BOARD ON PROFESSIONAL RESPONSIBILITY

By /s/ J. Randolph Wilson
J. RANDOLPH WILSON
Chair

Dated: February 14, 1989

DISTRICT OF COLUMBIA COURT OF APPEALS BOARD ON PROFESSIONAL RESPONSIBLITY HEARING COMMITTEE NUMBER NINE

Bar Docket No. 77–86

RESPONSE BY HEARING COMMITTEE NUMBER NINE TO ORDER REMANDING CASE FOR SUPPLEMENTAL REPORT

The Hearing Committee majority has revised and supplemented the majority report. These steps have significantly changed the conclusions originally offered by the majority. The Hearing Committee majority now holds that Bar Counsel has not proven violations of DR 1–102(A)(4), DR 9–103(A), DR 1–102(A)(5) or DR 2–106(A). The changes resulted from a clarification of the facts and opinions of the majority. The responses to the points raised by the Board are as follows:

(1) The Hearing Committee majority does credit Respondent's testimony as to the 1982 telephone conversation. Ms. Carter's testimony was vague and her memory faulty about current as well as past information. The majority finds that Respondent did have a good faith belief that he had obtained Ms. Carter's permission to take the additional fees.

(2) The Hearing Committee majority considers that the Respondent made the assumption that Ms. Carter could acquiesce in the additional fee on behalf of Ms. Byrd apparently based on the fact that Ms. Carter had signed the Rule 14 Consent form for Ms. Byrd. However, the majority finds

there was no other reason for this assumption. Respondent should have obtained a specific agreement from both heirs for the additional fee.

(3) The Hearing Committee majority does not find that Respondent had met "the other prerequisites to a valid 'separate agreement' for payment of additional fees," merely that Respondent had a good faith belief that he had a separate agreement for the additional attorney fee. The majority finds although the violations of the four cited Disciplinary Rules has not been proven, Respondent was lax and causal in his handling of this matter.

Respectfully submitted,

/s/ Lynn Suzanne Spradley, Esq./AW
LYNN SUZANNE SPRADLEY, ESQ.

/s/ Alice L. Norris
ALICE L. NORRIS

Dated: April 4, 1989

DISSENTING REPORT AND RECOMMENDATION OF HAMILTON P. FOX, III

This case presents an obvious example of a lawyer who has dishonestly misappropriated the funds of a small estate that he represented. Respondent essentially engaged in a shell game in order to deceive the Court and the two sisters, Ms. Carter and Ms. Byrd, who were the heirs to the estate, about the exact amount of his compensation. Relying on the fact that the sisters were elderly, that one of them lived outside of the District of Columbia, and that the estate was a very small one, he took the chance that he would get away with misappropriating a small amount of money. But the court was more vigilant than Respondent anticipated, and he was caught. For unknown reasons—possibly a combination of the fact that Respondent has practiced for almost 30 years, that the amount that he misappropriated was small, and that a likely sanction to a finding of dishonest misappropriation is disbarment—two members of the Hearing Committee have written a report which declines to find

the obvious, that Respondent dishonestly misappropriated funds of his client. Instead, the report, as amplified by the response to our remand order, dances a minuet around the facts to conclude that Respondent had a "good faith belief" that in a telephone conversation in 1982, Ms. Carter authorized him to take a legal fee over and above the statutory maximum of ten percent of the estate. Although Hearing Committee majority's initial report and recommendation found an unintentional misappropriation, the Board's remand order caused it to conclude that there were no disciplinary violations whatsoever.

The dissenting member of the Hearing Committee, in a much more persuasive Report and Recommendation, found dishonest misappropriation. A majority of the Board, confronted with the Scylla of overturning the findings of fact of the majority of the Hearing Committee and the Charybdis of allowing an obviously guilty Respondent to escape any discipline, has chosen a middle ground. The Board would find that Respondent unintentionally misappropriated the funds of at least one of the heirs, Ms. Byrd, who clearly did not consent to Respondent's taking an additional attorney's fee.

While the Board's approach is creative, even Solomon-like, I believe it is wrong. I believe the evidence establishes by a clear and convincing standard that Respondent dishonestly misappropriated the funds of this estate, and I believe the Board should so find and should accordingly recommend that he be disbarred.

The linchpin of the Hearing Committee's Report, which gives the Board so much trouble, is its finding that "respondent did have a good faith belief that he had obtained Ms. Carter's permission to take the additional fees." That language is contained in the Supplemental Report, but the matter of what Respondent "believed" and his "belief" is emphasized in the original report of the majority. See "Findings, Conclusions and Recommendations" at 8–12. I believe that it is not enough to simply conclude that Respondent's subjective state of mind was such that he believed he had the right to take the additional fee. Even if we credit the Hearing Committee majority's finding that he had such a belief, I think that his belief must have some objectively reasonable basis in fact in order to justify a finding that Respondent did not act dishonestly. I can find no objectively reasonable basis for Respondent's having formed such a belief.

Respondent testified that in 1982, he had a telephone conversation with one of the two sisters, Ms. Carter, in which he obtained her permission to charge a fee over and above the statutory maximum (Tr. II 118–20). Ms. Carter recalled no such conversation (Tr. II 16, 22). Respondent has no notes or memoranda of this telephone conversation (Tr. II 132–33). This "agreement" was not reduced to writing, despite the fact that Respondent's own expert testified that if such an extraordinary arrangement were entered into, it must be based on an explicit agreement (Tr. II 92–96). Respondent makes no claim to have obtained the permission of the other sister, Ms. Byrd (Tr. II 160); instead he apparently claims that since Ms. Carter had earlier signed Ms. Byrd's name to a court document, he assumed that she was authorized to agree on Ms. Byrd's behalf to the payment of this additional fee. This is the evidence on which Respondent relies to assert that he had a reasonable belief that these two ladies consented to paying him an additional sum which reduced by a third the amount they would inherit from the estate of their late brother.

I do not think that this is sufficient basis for any lawyer forming an objectively reasonable belief that he had permission to take his client's funds as a fee. Moreover, the totality of Respondent's behavior demonstrates clearly that far from obtaining the explicit permission of the heirs to take this additional fee, he did everything in his power to prevent them and the court from ascertaining what his fee was. Respondent filed accounts for the estate with the probate division in April of 1982 (BX 19) and July, 1982 (BX 23). On neither occasion did he send a copy of the account to Ms. Carter or to Ms. Byrd. Moreover, one week after filing the first account, Respon-

dent addressed a letter to Ms. Carter informing her that he had done so, and requesting that she sign a consent form. BX 20(a). The letter did not include a copy of the final account. He thus obtained her signature, and her signature as the supposed agent of her sister, on a form consenting to the filing of this account, without ever showing either sister exactly what the account stated. The account stated, in pertinent part, that Respondent was being paid 10 percent of the estate, $284.37, as administrative expenses. This was the statutory maximum.

In April, 1983, after the court had approved the restated account filed in July of 1982, Respondent sent the first written communication to his clients which informed them of what he was allegedly being paid. Those letters (BX 5(a), 5(b)) informed the sisters that the total amount received was $1,269.16, that attorney's fees in the amount of $400 were being paid to Respondent, and that each sister was receiving $434.58. Checks in that amount were enclosed in the letters. There was no mention of the fact that Respondent was also receiving a 10 percent commission over and above the $400 attorney's fees. In contrast to his letters to the heirs, the restated account, which had been filed with the court, indicated that each heir was receiving $687.69 and that Respondent was receiving $284.37. In short, Respondent told the court one thing—that he was being paid $284.37—and he told the sisters another—that he was being paid $400. He told no one the truth—that he was being paid $684.37. In the face of this conduct, I find it impossible to agree with the Board that any misappropriation was unintentional and not dishonest.

Not only did Respondent make inconsistent and inaccurate representations to the court and to the heirs of the estate, but also he resisted, to the point of being dismissed as the attorney for the estate, disclosing the actual amounts to the court. Although Respondent was required to file receipts with the court, which would have showed that he had distributed to the heirs less than the amount approved by the court, he failed to file these receipts despite several official requests (BX 24(a), 24(b)). After missing a final deadline from the probate division, the court ordered a summary hearing (BX 25(a), 25(b)). Respondent failed to appear at the summary hearing and was removed as administrator (BX 26(a)). This conduct is strong evidence that Respondent did not wish to disclose to the court what he had actually disbursed to the heirs. To do so would have exposed his misappropriation.

The successor administrator, realizing that the heirs had not been paid the amount shown in the approved account, contacted Respondent. Although Respondent was later to testify before the Hearing Committee about his supposed telephone conversation with Ms. Carter in 1982, he made no mention of it in his written response to the successor administrator (BX 30). Instead, his response was vague, claiming only that the funds were outside the jurisdiction of the probate court but with no details as to when he was authorized to pay himself these funds and for what reason. His response implied that these fees were paid for separate legal work which he had performed for the sisters in addition to his handling of the estate. The letter also treated the fee as though it had been paid to him by the sisters after the full distribution of the estate when in fact it was paid from the proceeds without reporting it to the court.

Respondent testified that he did not believe he would actually have to file the receipts for an estate as small as this one (Tr. II 142–44). That testimony is probably the explanation for how Respondent thought that he could get away with paying the heirs less than he was authorized. By filing separate documents with the courts from those he sent to the heirs, and by ignoring the court rules which required him to file receipts, hoping that the rules would not be enforced because of the size of the estate, Respondent anticipated escaping scrutiny. He did not do so, and only then did he put forth his story, corroborated by no evidence, that Ms. Carter had previously authorized him to accept an additional fee. This story was eventually re-

fined to include the supposed telephone call in 1982, the details of which are vague, which Ms. Carter did not recall, which her sister emphatically did not participate in or endorse, and for which there was not written corroboration, despite the testimony of Respondent's own expert about the formal steps which should have been taken in the event that such an additional fee were to be charged (Tr. II 92–96).

I agree with the dissenting member of the Hearing Committee. This record constitutes clear and convincing evidence that Respondent engaged in a dishonest misappropriation. I also think that the appropriate discipline for such dishonest misappropriation is disbarment.

By: /s/ Hamilton P. Fox, III
HAMILTON P. FOX, III, ESQ.

Date: July 23, 1989