In re Hendrith V. SMITH, Respondent.

**A Member of the Bar of the District of Columbia Court of Appeals.**

**No. 02–BG–139.**

District of Columbia Court of Appeals.

Argued Nov. 14, 2002.
Decided Feb. 27, 2003.

---

John O. Iweanoge, Washington, DC, for respondent.

H. Clay Smith, III, Assistant Bar Counsel, with whom Joyce E. Peters, Bar Coun-

sel, was on the brief, for the Office of Bar Counsel.

Before SCHWELB and WASHINGTON, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior J.

The Board on Professional Responsibility has recommended that we disbar respondent, Hendrith V. Smith, from practicing law in the District of Columbia. The proposed discipline is premised on Hearing Committee findings, accepted by the Board, that respondent had violated two Rules of Professional Conduct: Rule 1.15(a) (commingling and misappropriation), and Rule 1.17(a) (failure to designate trust or escrow account). Contrary to the Hearing Committee's ultimate finding, however, the Board concluded that respondent's misappropriation of client funds was reckless, not merely negligent, and thus warrants disbarment, not the one-month suspension recommended by the Hearing Committee. On this record we must agree with the Board and order disbarment.

## I.

Respondent was sworn in to the District of Columbia Bar on January 6, 1997. The following month, in opening his own, solo law practice, he established two accounts at Nations Bank: a business checking account and an IOLTA (trust) account. Five months later, respondent took on an automobile personal injury lawsuit for plaintiff Salha Saleh, a client referred by Roberta Wright, Esquire after Wright had executed on Saleh's behalf an Assignment and Authorization (A & A) agreement[1] with a medical provider, Neurodiagnostic Associates. After negotiating a recovery for Sa-

leh, respondent deposited the settlement check for $2,920.36 (which Saleh had endorsed) in his business checking account on September 15, 1997. Included in that amount was an unquestioned attorney's fee of $972.47, leaving $1,947.89 allocable to Saleh.

To fulfill the A & A agreement, respondent sent Neurodiagnostic a check on Saleh's behalf dated October 23, 1997 for $1,220. By October 30 Neurodiagnostic had not received the check, but told respondent to wait for awhile before issuing a new one in order to see whether the check would arrive. After several weeks the check apparently had been lost. Respondent issued another on December 4, which Neurodiagnostic deposited on December 12. The check cleared.

On the day he wrote the first check, October 23, respondent also wrote Saleh to say that he had paid Neurodiagnostic $1,220. He included a copy of the check. Saleh became angry that respondent had paid Neurodiagnostic, because she had been pressuring him to give the settlement funds to her while promising that she would pay the medical bills herself. Respondent initially believed—as the Hearing Committee and Board found—that he was duty-bound to pay the other medical providers in full rather than sending Saleh the money to pay them (as he believed she would) "on an installment basis." After conferring with referral attorney Wright, however, respondent decided that it would be appropriate to send Saleh $727.89—the account balance remaining after payment of his fee and Neurodiagnostic's bill—while expressing his expectation that Saleh would pay the rest of her medical bills. Respondent mailed a check for that amount on October 29; Saleh deposited it

1. An A & A—a form of agreement typically used in accident cases signed by the attorney and the client—secures payment to the medi-

cal provider upon the conclusion of the matter or whenever client funds come into the hands of the attorney.

on November 18; and that check also cleared.[2]

During the period between September 15, 1997, when respondent deposited the settlement check, and December 12, 1997, when the checks issued to Saleh and Neurodiagnostic, respectively, had been deposited and cleared, respondent wrote checks for business and personal expenses that caused his business account—containing the settlement funds—to fall on many days considerably below the amount required to cover his client's entrusted funds. Specifically, within two days of the settlement check deposit, respondent's business account dipped to $1,611.01, well below the $1,947.89 (representing settlement proceeds net of legal fee) that respondent was obliged to hold for Saleh's benefit. Thereafter, between September 17 and October 14, 1997, a period *before* respondent issued checks to Neurodiagnostic and Saleh, the account balance fluctuated between $249.54 and $1,794.48. During this period when the account continuously was under the client's $1,947.89, respondent inquired of the bank seven times for his account balance. These repeated inquiries establish, as the Board found, that respondent knew he was using settlement proceeds for personal purposes, since the bank would have reported balances well below $1,947.89 *before* respondent had begun to disburse any client funds.

Next, between October 23 and November 17, a period during which respondent's checks to Neurodiagnostic, then Saleh, for $1,220 and $727.89, respectively, were outstanding, the account held balances ranging from -$673.09 to $1,295.74, substantially below the $1,947.89 required to cover the two client-related checks. More specifically, on October 29, six days after issuing the first check to Neurodiagnostic, respondent wrote a check to Saleh for the remaining $727.89. That day, as well as the day before (October 28), he inquired as to his account balance, which ranged during that two-day period between $270.74 and $922.08—not nearly enough to cover both the Neurodiagnostic and Saleh checks. Nor was the account sufficient to cover both checks four days later, on November 2, the date Saleh received her check in the mail. Furthermore, even with the first Neurodiagnostic check outstanding, bank records in evidence show that if Saleh had tried to deposit her check between November 5 and 17, 1997, the account would have been insufficient to cover her $727.89.

The Board found, moreover, that respondent knew his business account was below the amount he was required to hold in trust because his inquiries of the bank, almost daily, would have revealed "on at least some occasions" that the balance was insufficient to cover the entrusted funds. The bank statements in the record confirm this finding; during the period between October 20 and November 1, respondent made eleven inquiries, one of which would have shown a negative account balance and all of which would have disclosed a balance below $1947.89. In particular, the inquiry on October 21, 1997, two days before respondent wrote the first $1,220 check to Neurodiagnostic, showed only $1,273.56 in the account. Although this would have been enough to cover the $1,220, the balance remaining—$53.56—was far below

2. After the Hearing Committee and the Board state that Saleh had cashed her check from respondent, numbered 1150, on November 18, 1997, the bank statements for 11/1/97–11/30/97 and 12/1/97–12/31/97, both of which are in the record, do not show that check number 1150 ever was presented to the bank. Since neither party disputes that the check was cashed on November 18, 1997, we will accept the Hearing Committee and Board's finding of fact to that effect.

the $727.89 necessary to pay Saleh's other medical providers. And between October 31 and November 17, 1997, the first $1,220 check would have bounced if Neurodiagnostic had found and presented it, because the account balance during that period had fallen below that amount.

Finally, after Saleh deposited (and thus cashed) her check on November 18, 1997, respondent's business account retained funds insufficient to cover the $1,220 still owed to Neurodiagnostic. Specifically, between November 26 and December 1, the account held from $561.94 to $980.57, and between December 5 and 8, the balance ranged from -$747.63 to $1,152.37. Respondent's December 4 check to Neurodiagnostic thus cleared only because it was deposited later, on December 12.

The Hearing Committee and the Board rejected Bar Counsel's charge of dishonesty, as do we.[3] As to the principal charges, however, the Hearing Committee found culpability, in particular commingling and misappropriation of settlement funds in violation of Rules 1.15(a)[4] and 1.17(a).[5] As to commingling, the Committee found that respondent had believed—mistakenly—that because the settlement money was owed to third party medical providers, the Rules of Professional Conduct did not require him to deposit the settlement check in his IOLTA (trust) account. As to misappropriation, the Committee determined that respondent's insufficient balances—reflecting personal use of the settlement funds—had resulted from poor accounting practice: relying solely on periodic bank inquiries rather than maintaining a detailed ledger tracking the account balance. Based on respondent's mistaken understanding of the commingling rule and on his poor record-keeping that, taken together, caused an "accidental misappropriation," the Hearing Committee concluded that respondent's Rules violations were no worse than negligent. It thus recommended a one-month suspension from the bar. Contrary to the Hearing Committee, however, the Board concluded that on the

3. The Hearing Committee concluded, and the Board agreed, that Bar Counsel had no basis for its charge of dishonesty attributable to respondent's letter to Saleh confirming that he had sent a check to Neurodiagnostic. The Board accepted the Committee's finding that the record lacked evidence that respondent had prevaricated or otherwise intended to mislead Saleh. The Board also agreed that respondent's compliance with the A & A agreement by paying Neurodiagnostic and resisting Saleh's pressure to forward all settlement proceeds to her had been entirely appropriate.

4. Rule 1.15(a) states: "A lawyer shall hold property of clients or third persons that is in the lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in a financial institution which is authorized by federal, District of Columbia, or state law to do business in the jurisdiction where the account is maintained and which is a member of the Federal Deposit Insurance Corporation, or the Federal Sav-

ings and Loan Insurance Corporation, or successor agencies. Other property shall be identified as such and appropriately safeguarded; provided, however, that funds need not be held in an account in a financial institution if such funds (1) are permitted to be held elsewhere or in a different manner by law or court order, or (2) are held by a lawyer under an escrow or similar agreement in connection with a commercial transaction. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation."

5. Rule 1.17(a) states: "Funds coming into the possession of a lawyer that are required by these Rules to be segregated from the lawyer's own funds (such segregated funds hereinafter being referred to as "trust funds") shall be deposited in one or more specially designated accounts at a financial institution. The title of each such account shall contain the words "Trust Account" or "Escrow Account," as well as the lawyer's or the lawyer's law firm's identity."

facts here respondent's actions were reckless, not negligent, and that our case law requires disbarment for all instances of reckless misappropriation.

## II.

This court must accept the Board's findings of fact unless unsupported by substantial evidence of record. *In re Cooper*, 591 A.2d 1292, 1294 (D.C.1991). In addition, "[w]e are bound to accept the recommended disposition of the Board 'unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted.'" *In re Confidential (J.E.S.)*, 670 A.2d 1343, 1346 (D.C.1996) (quoting D.C. Bar R. XI § 9(g)(1)).

While commingling and misappropriation are related and often concur, they are separate violations. In this case, however, although the charge presents a compound violation, we address each concept independently, not only to assure precision of analysis but also to recognize respondent's separate defense as to each.

Unquestionably, respondent commingled his client's funds with his own funds when he deposited the settlement check in his business account. *In re Haar*, 698 A.2d 412, 416 (D.C.1997) (commingling results when "a client's settlement check is deposited in the lawyer's personal bank account containing 'funds other than client funds'") (citing *In re Ingram*, 584 A.2d 602, 603–04 (D.C.1991)). Respondent does not contest the commingling as such but argues in defense that he misunderstood the commingling rule. The Hearing Committee accepted this defense, finding that respondent—mistakenly—did not think the rule requiring the deposit of client settlement funds in a separate trust account also applied to funds that (in the Committee's words) "were not owed to the client but to third party medical providers and himself as fees."

It seems obvious that the policy forbidding the commingling of proceeds held for a client with the lawyer's own funds would apply equally to the commingling of proceeds held for a client though payable directly to third parties, as Rule 1.15(a) expressly provides. *Supra,* at note 4. In either situation the client ultimately will be vulnerable for any loss attributable to lawyer misconduct. Nonetheless, we see no basis for rejecting the Hearing Committee's finding that respondent's testimony claiming mistake of law—heard by the Committee and not by this court—was credible. We are especially persuaded because that testimony is buttressed by two facts of record. First, respondent set up an IOLTA (trust) account for settlement funds, recognizing that client trust funds typically must be kept separate from the lawyer's own, and thus arguably evidencing his mistaken belief that proceeds held for third parties—which he deposited in his business account—somehow were different. Second, in asserting his belief that no rule barred the commingling of funds earmarked for payment to the client's third-party payees, respondent has not claimed the right to use those funds, even briefly, for his own purposes.[6] He appar-

---

6. Respondent answered questions at the Hearing Committee hearing as follows:

Q. Did you think you had a better right to that money than Ms. Saleh?

. . .

A. No.

Q. The reason I ask that is because it appeared that there was a point being made

that perhaps the funds didn't carry the same importance—that your use of the funds didn't carry the same importance if they were funds that belonged to her health care providers as opposed to belonging to Ms. Saleh.

Do you have any understanding that you could use the money that was earmarked

ently believed he could commingle, yes, but he seemed aware that he must not allow the account balance to dip below an amount necessary to cover all client obligations.

■ We have noted that a lawyer's mistake about the applicability of an ethical rule cannot excuse or even mitigate misconduct when the lawyer has violated a rule fundamental to governance of the legal profession. *In re Haar*, 698 A.2d at 425 n. 13. If a failure to understand the most central Rules of Professional Conduct could be an acceptable defense for a charged violation, even in cases of good faith mistake, the public's confidence in the bar and, more importantly, the public's protection against lawyer overreaching would diminish considerably. Respondent's mistake-of-law defense, therefore, does not negate to any extent his improper commingling. The most appropriate disciplinary sanction for that commingling as such, however, was not the critical concern that has led to recommended disbarment. The more serious violation at issue is the charged *misappropriation* of commingled funds. This compound offense is defined by our case law to include any instance—however minor—when a commingled account "falls below the amount due the client," *In re Anderson*, 778 A.2d 330, 335 (D.C.2001), an event that ordinarily signals "unauthorized temporary use" of client funds, which we have held violates the Rules of Professional Conduct whether the lawyer benefits personally or not. *In re Harrison*, 461 A.2d 1034, 1036 (D.C.1983) (commingling and misappropriation). The misappropriation charge, as an abuse of commingling, will thus be determinative here if sustained. And so we turn to misappropriation.

■ The record facts recited earlier demonstrate, unambiguously, that respondent did not merely permit the commingled account to drop from time to time below the amount held for his client's benefit. Rather, he allowed those deficits to increase to several hundred dollars for days, even weeks, at a time. This activity reflected respondent's personal use of substantial percentages of client funds that, as a result, on many days were unavailable for the third parties whom respondent was duty-bound to pay. The fact that the commingled account held enough funds when Saleh and Neurodiagnostic's · presented their checks for payment was thus fortuitous as well as fortunate—and legally irrelevant. Misappropriation does not depend on injury in fact. *See In re Addams*, 579 A.2d 190, 199 (D.C.1990) (en banc).

In contrast with his defense of commingling, respondent does not claim he mistook the law in permitting the commingled account to reflect misappropriation. He relies, rather, on a faulty recording-keeping defense. He acknowledges he was negligent (as the Hearing Committee found) in keeping bank records that failed to signal likely misappropriation that presumably he would have prevented had he tracked his funds with due care. Respondent relies on cases such as *In re Reed*, 679 A.2d 506, 508 (D.C.1996), and *In re Evans*, 578 A.2d 1141, 1142 (D.C.1990), in which we held that a lawyer's misappropriation of client funds attributable to improper record-keeping had resulted from negligence, not from more egregious behavior. While these decisions do allow for a finding of negligent misappropriation, they do not mean that all misappropriation based on poor record-keeping must be held negli-

for her health care providers because it was her health care providers as opposed to her?

A. No, sir.

gent, never reckless or intentional. Each case turns on its facts. *See In re Anderson,* 778 A.2d at 339.

Viewed in its totality, respondent's conduct demonstrated extreme disregard for the security of settlement funds held for his client. Although there was enough money in respondent's business account when Saleh and Neurodiagnostic happened to present their checks for payment, respondent's account held a balance below the amount of undistributed, entrusted funds during four substantial periods of time totaling sixty-two of the eighty-nine days between September 15, when respondent deposited the settlement check, and December 12, when Neurodiagnostic, as the latter of the two client-related payees, cashed its check. In fact, the account began to dip below the amount of entrusted funds within two days after respondent deposited the settlement check, and it reflected a negative balance on twelve occasions.

Of compelling significance, moreover, we agree with the Board that—from respondent's frequent account inquiries during periods when the balance was significantly below the amount he was required to hold for his client—respondent knew that the balance was insufficient to cover the outstanding checks disbursed for his client. *In re Micheel,* 610 A.2d 231, 236 (D.C. 1992). The Hearing Committee's finding of negligence—suggesting that respondent's poor record-keeping may have left him unaware that he was misappropriating client funds—is unsupported by the record in light of the bank records that informed his many inquiries. The Board accordingly was correct in rejecting that Committee finding and its recommended sanction. Respondent's conduct while he was conscious of the account's deficiencies was so persistent, in contrast with the limited instances of misappropriation in *Reed* and *Evans,* that we cannot gainsay the Board's determination that his misappropriation was reckless, not merely negligent.

As a result, this division of the court is bound to accept the Board's recommendation of disbarment, the sanction consistently imposed for reckless misappropriation. *In re Withers,* 769 A.2d 784 (D.C.2001); *In re Utley,* 698 A.2d 446 (D.C.1997); *In re Pels,* 653 A.2d 388 (D.C.1995). There are misappropriation cases, to be sure, finding lawyers negligent, not reckless, in taking fees from estates before a formal accounting confirmed their entitlement. *In re Travers,* 764 A.2d 242, 245, 250 (D.C.2000); *In re Ray,* 675 A.2d 1381, 1387 (D.C.1996). But the Board distinguished these cases on the ground that the misappropriation rule, as applied in that context, was not fundamental to the ethical standards governing the legal profession. In contrast, according to the Board—and we agree—respondent has violated rules against commingling and related misappropriation so fundamental in protecting the client public that the many, prolonged derelictions evident here cannot be seen as mere negligence.

The Board also concluded, and we agree here as well, that there are no extraordinary, mitigating circumstances that would justify a lesser sanction or a suspension or stay of disbarment. *In re Addams,* 579 A.2d at 191; *In re Pels,* 653 A.2d at 398. We therefore must order Smith's disbarment from the practice of law in the District of Columbia effective thirty days from the date hereof. D.C. Bar R. XI § 14(f).

*So ordered.*

SCHWELB, Associate Judge, concurring.

I concur in the judgment and join Judge Ferren's carefully documented opinion. I

note only, as I did in my separate opinion in *In re Addams*, 579 A.2d 190, 203–10 (D.C.1990) (en banc), that lawyers who have not misappropriated client funds, but who have nevertheless acted far more dishonorably than respondent Smith did, have received substantially more lenient discipline.