**In re ESTATE OF Leroy GREEN.**

**John H. Pye, Jr., et al., Appellants**

**v.**

**Kenneth J. Loewinger, Appellee.**

**No. 03–PR–246.**

District of Columbia Court of Appeals.

Argued June 24, 2004.

Decided Dec. 21, 2006.

Nicholas D. Ward, with whom James F. Bromley, Washington, DC, was on the brief, for appellants.

Kenneth J. Loewinger, appellee pro se.

Before RUIZ, Associate Judge, and STEADMAN and TERRY, Senior Judges.*

* Judge Steadman was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on October 18, 2004.

TERRY, Senior Judge:

This appeal concerns what is colloquially known as a "side agreement" for an additional fee between appellant Pye, the first successor personal representative of the estate of Leroy Green, and seven of Mr. Green's heirs.[1] Mr. Pye appeals from an order of the trial court, filed January 30, 2003, entering judgment against him and his surety for $9,458.16, plus $1,702.47 in interest at 6 percent per annum from March 31, 1999, as well as fees and costs incurred by appellee. The court ruled as it did because it concluded (1) that Mr. Pye did not have a valid side agreement with the seven heirs for an additional fee, and (2) that his failure to turn over the financial records of the estate caused the estate to incur extra expenses.

On appeal, Mr. Pye makes four claims of error. First, he asserts that he entered into a valid side agreement for an additional fee with the seven heirs. Second, he argues that the court erred in relying on his failure to turn over financial records to the successor personal representative as a basis for finding the side agreement invalid. Third, Mr. Pye maintains that Kenneth Loewinger, his successor as personal representative, did not have standing to object to the side agreement because the seven heirs who entered into the agreement did not object to it. Fourth, Mr. Pye contends that the amount of pre-judgment interest awarded was incorrect because the court should have calculated such interest separately from the dates of the three withdrawals that he made from the estate.

With respect to the first claim, we hold that the side agreement was invalid because appellant, by entering into the agreement, breached his fiduciary duty to the heirs. The means that appellant employed to bring about the side agreement did not further the best interests of the heirs. We reject appellant's second claim because it is clear from the record that the trial court did not rely on appellant's failure to provide financial records as a basis for holding the side agreement invalid. As for the third claim, we hold that Mr. Loewinger had standing to object to the side agreement because the Probate Code allows a personal representative to petition the court "to act in any matter relating to the administration of the estate" and to bring any action necessary to recover possession of estate property. Finally, we agree with appellant that the trial court should have separately calculated pre-judgment interest for each of the three withdrawals he made, according to the dates on which the funds were taken out of the estate. We therefore remand the case so that the trial court can recalculate the pre-judgment interest, as set forth in part V of this opinion, but in all other respects we affirm the judgment.

I

On March 3, 1993, Leroy Green died intestate in the District of Columbia. His estate consisted of liquid assets worth approximately $46,000 and a home on Ames Street, N.E. On July 20, 1994, appellant Pye was appointed successor personal representative of Mr. Green's estate.[2]

---

Judge Terry was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on February 1, 2006.

1. There are three appellants in this case, Mr. Pye and his two sureties. We shall use the term "appellant" to refer only to Mr. Pye unless the context indicates otherwise.

2. The original personal representative died on February 28, 1994, and the co-personal representative was removed on July 20, 1994.

On December 27, 1996, appellant filed his Second and Final Account of the estate for the period from June 1, 1995, to December 27, 1996.[3] That accounting listed an attorney's fee of $44,000.00 and anticipated expenses owed to appellant in the amount of $1,201.00. Three days later, on December 30, appellant filed a Request for Compensation for Services, in which he asked for a fee of $44,000.00,[4] plus $1,000.00 for expenses. He also filed an Amended Second and Final Account on April 29, 1997, to correct certain errors in the distributive shares. On July 17, 1997, five of the decedent's seventeen heirs filed an objection to appellant's request for compensation. On January 26, 1998, the probate court issued an order allowing appellant to submit an affidavit in lieu of vouchers to explain certain account entries.

On August 5, 1998, the probate court (Judge Long) issued a lengthy and detailed order addressing appellant's Amended Second and Final Account and his Request for Compensation. In that order, the court approved only $28,041.84 of the $44,000.00 fee that appellant had requested, and disallowed his request for expenses because of his "extraordinary failure" to justify and document them. In determining the fee, the court adhered to the statutory factors set forth in D.C.Code § 20–751(c) (1989).[5] The court said that Green's estate was "not complex," that appellant's billing was "excessive in numerous respects, and that he [did] not provide sufficient facts to explain how certain billings could have benefitted this estate." After disallowing $12,385.20 in fees, the court determined that appellant had earned a fee of $35,052.30 for his work.[6] However, "[a]s a sanction for the gross overbilling and lack of documentation," the court applied "a twenty percent reduction to the fees that [it] would otherwise approve."[7] Appellant's Final Account was held in abeyance, and the staff of the Probate

---

3. Appellant filed his First Account on June 1, 1995, covering the period from August 1, 1994, to May 31, 1995. The probate court approved the First Account on February 28, 1996.

4. Although appellant requested $44,000.00, the actual number of hours he billed to the estate (347) multiplied by his hourly rate ($125.00) would result in a fee of $43,375.00.

5. The factors listed in section 20–751(c) include "the reasonable relationship of proposed compensation to the nature of the work performed" and "the reasonableness of the time spent, including the number of hours spent and the usual hourly compensation for the work performed." D.C.Code § 20–751(c)(1), (3) (1989).

   Section 20–751 was amended by the Probate Reform Act of 1994, D.C. Law No. 10–241 (1995), which eliminated the requirement that a personal representative seek court approval before receiving fees from an estate. This amendment, however, was made applicable only to the estates of decedents who died after its effective date of July 1, 1995. *See*

Historical and Statutory Notes to D.C.Code § 20–701.01 (2001). This court has consistently applied the former version of section 20–751(a) in cases (such as this one) in which the decedent died before July 1, 1995. *See, e.g., In re Fair,* 780 A.2d 1106, 1111 n. 12 (D.C.2001); *In re Estate of King,* 769 A.2d 771, 777 n. 7 (D.C.2001); *In re Travers,* 764 A.2d 242, 245 n. 1 (D.C.2000).

6. Appellant suggests, in footnote 1 of his brief, that the court may have miscalculated this amount. We need not decide whether in fact there was any error in computation. If there was in fact an error in the calculation that still needs to be corrected, the parties and the court on remand can do whatever is necessary to correct it.

7. The court noted that the normal sanction was a 10 percent reduction in fees for the "failure to delineate the hours expended in a reasonably rounded fashion," but that "the blatant nature of [appellant's] overbilling and lack of substantiation for the claim" warranted a 20 percent reduction.

Division was ordered to "recompute the relevant figures on the pending First [sic] and Final Account, so as to include the revised, court-approved fees and the new computation of the distributions to heirs." [8] The court also ordered appellant to "file no later than November 2, 1998, *receipts* from all heirs to establish that their complete and accurate final distributions have been received, prior to the presentation of the Account *for final judicial review*" (emphasis in original).

About a month later, appellant filed a "Motion for Application for Entry of Judgment, for Stay of Enforcement of Order Pending Appeal, and for Increase in the Amount of the Successor Personal Representative's Bond." [9] In its order granting the motion, dated January 26, 1999, the court directed that its August 5 order be entered as a final judgment,[10] that the filing of distribution receipts be stayed pending appeal,[11] and that appellant post an additional bond of $16,000, thereby increasing the total amount of his bond to $20,000.

At some point between January 26 and February 17, 1999, appellant wrote a letter to the decedent's heirs asking them if they would pay the difference between the fee he had requested and the fee approved by the probate court.[12] Appellant informed the heirs that the court had "reduce[d] my fee and charges by $17,159.30," [13] and that he would "take an appeal on or before February 25, 1999, unless this matter can be resolved before then." He explained that because of the stay that had been granted by the probate court (at his request), he would "not be in a position to make a distribution to [the heirs] until the Court of Appeals decides my appeal, which most probably will not be for at least another year." His letter strongly implied that regardless of the outcome of the appeal, the heirs would not receive any portion of their share for "at least a year" if they did not settle with him. Moreover, appellant explained to the heirs that "none of you is receiving a substantial distribution," and that his additional fee would not significantly alter the amount of their shares.[14] Appellant concluded the letter by stating:

8. These revisions were completed and sent to appellant a few weeks later. The Second and Final Account, as amended by the Probate Division staff, was approved by the court on July 20, 1999.

9. Appellant asked the court to rule that its August 5 order was a final order, which would make it appealable. He also requested a stay of the order, which directed him to pay to the heirs their shares of the estate, so that the asset base for his fee would be preserved.

10. *See* Super. Ct. Prob. R. 8(b).

11. *See* Super. Ct. Prob. R. 9(a).

12. There is only one undated copy of appellant's letter in the record, which is not specifically addressed to any of the heirs. There are, however, seven responses from those heirs who agreed to pay the additional fee. Six of those seven responses are dated either February 17 or February 22, 1999; the sev-

enth is dated September 7, 1999. From these dates we conclude that appellant's letter was sent sometime between the date of the court's order (January 26) and the date of the first response (February 17).

13. This apparently refers to the difference between the fee awarded by the court ($28,041.84) and the fee and expenses that appellant had requested ($44,000.00 plus $1,201.00). The arithmetic is off by 14 cents; the correct figure should be $17,159.16, not $17,159.30.

14. Appellant wrote in his letter to each heir:

Those of you who receive a 10% share would receive $9,933.93 instead of $8,218.00, an increase of $1,715.93. Those of you who receive a 5% share would receive $4,966.97 instead of $4,109.00, an increase of $857.97. Those of you who receive a 3.333% share would receive

If you are willing to settle the matter on these terms, please sign the enclosed copy of this letter, and I will send you your distribution as originally shown on the second account after I have received everyone's response. I will then note the appeal settled and dismissed. If you would like to discuss this matter with me, you can contact me [by telephone]. . . .

Six of the seventeen heirs quickly signed and returned their responses to appellant.[15] The responses stated that they were agreeing to a reduced "distributive share." On September 7, 1999, a seventh heir agreed to pay appellant an additional fee.[16]

On February 26, 1999, after six of the heirs had agreed to pay an additional fee, appellant noted an appeal from the court's now-final order of August 5, 1998. Then, on April 6, 2000, he filed a motion to dismiss that appeal voluntarily, stating that "[t]he issues which prompted the appellant to file this appeal have been resolved with most of the interested persons of the Estate of Leroy Green." Although this court promptly granted appellant's motion and dismissed the appeal,[17] he did not distribute the remainder of the estate to those heirs who had declined to pay the additional fee.[18]

On October 26, 2000, the Register of Wills notified appellant that a hearing would be held on December 12 to address his failure to file receipts showing proper distribution to all of the heirs, as required

---

$3,310.97 instead of $2,739.00, an increase of $571.97. Lastly those of you who receive a 2.5% share would receive $2,482.98 instead of $2,054.00, an increase of but $428.98. The question is how long do you want to wait?

It appears that appellant based his figures for the increased shares on the Probate Division's Amended Second and Final Account, which he had received a few months earlier. However, each of the amounts that he stated for the increased shares is approximately $5 to $10 less than the corresponding amount as set forth in the Probate Division's Amended Second and Final Account, which recalculated the distributive shares based on the reduced fee that the court had awarded to appellant. The Probate Division's Account stated that the increased shares were in the amounts of $9,943.93, $4,971.65, $3,314.64, and $2,486.30. Nowhere in his letter or in any other document in the record does appellant explain why his figures do not match those submitted by the Probate Division.

**15.** See note 12, *supra*. The six heirs who agreed to pay appellant an additional fee were Clyde Green, Blake Green, Juanita Norris, Vernise Furman, Zenobia McKay, and Bertha Hudson. The first five received their individual shares, ranging from $2,054.00 to $8,218.00, on various dates in March and April 1999. As for Bertha Hudson, appellant stated in a Supplemental Account which he submitted on July 15, 2002, that her "check never cleared for $4,109.00." Neither this Supplemental Account nor Mr. Loewinger's reconstructed Account shows the date on which appellant attempted to send Bertha Hudson her reduced share. In light of this record, it appears that she may not have received her share. Whether she did or did not is a question which the court may need to resolve on remand.

**16.** This seventh heir was Leroy Gassaway. His reduced share of $8,218.00 was distributed in two payments of $6,218.00 and $2,000.00.

**17.** *In re Estate of Green*, No. 99–PR–239, Order entered April 14, 2000 (unpublished).

**18.** Appellant's Supplemental Account of July 15, 2002, stated the amounts that the remaining heirs were entitled to receive, but he did not set forth in that document a date of distribution or a check number for their shares, as he had done for the seven heirs who paid the additional fee. Mr. Loewinger's reconstructed Account states "Canc[eled] check not provided" for those heirs who did not agree to the additional fee. Mr. Loewinger later informed the probate court that he was the one who paid the remaining heirs.

by Judge Long's order of August 5, 1998.[19] At that hearing the court (Judge Christian) removed appellant as successor personal representative because he had failed to file those receipts. Appellee Loewinger was appointed second successor personal representative, and the court directed him to "attempt to file a final, restated account on behalf of Mr. Pye and request appointment of a special master if unable to so state the account." The court also referred the matter to the Office of Bar Counsel "for such action as is deemed appropriate."

In the course of his review of the estate, Mr. Loewinger discovered that the Probate Division's Amended Second and Final Account showed that the estate had $99,439.00 available for distribution to the heirs. Appellant had turned over to Mr. Loewinger $42,700.00 in estate assets, but he did not provide Loewinger with financial records explaining what had become of the remaining $56,739.00. The only document that he did turn over was a copy of the Second and Final Account which he had filed with the court. Because he could not determine which heirs had been paid and the amounts of those payments, Mr. Loewinger filed a petition for an order directing appellant to show cause for his failure to turn over the requested documents. On November 28, 2001, the court ordered appellant to turn over his file so that Mr. Loewinger could make a copy of it. Appellant, however, did not provide Mr. Loewinger with any bank statements, checks, or other documentation explaining the discrepancy between the Probate Division's Amended Second and Final Account and the assets that he had turned over to Loewinger.

It was at this point that appellant told Mr. Loewinger that he did not have the estate's financial records because his file containing those records had been in a briefcase that was stolen from his office.[20] As a result, Mr. Loewinger subpoenaed various banks in order to obtain the necessary documentation. He then attempted to reconstruct the entire administration of the estate from the date of Mr. Green's death to January 31, 2001.[21] In due course he discovered that appellant owed the estate (1) $10,600.00 for failing to restore funds that had been transferred to his personal account, and (2) $3,968.13 for failing to turn over a Citibank certificate of deposit.

On April 15, 2002, Mr. Loewinger filed a Motion for Entry of Judgment against appellant in the amount of $14,578.13,[22] the total of the sums that appellant owed the estate, plus interest. In his motion Loewinger listed several reasons for seeking judgment. First, he asserted that appellant had "continued to administer the

---

**19.** Appellant was bound by the August 1998 order directing him to file receipts because the stay that had previously been granted by the court automatically expired when the appeal was dismissed in April 2000.

**20.** The date of the alleged theft is unknown. Moreover, there is nothing in the record to show that appellant ever filed a police report, made a notation of the theft, notified the probate court or Mr. Loewinger of the theft when it happened, or attempted to reconstruct the missing file.

**21.** Appellant asserts in his brief that it was not necessary for Mr. Loewinger to recon- struct the entire administration of the estate. We are satisfied, however, that such action was necessary in light of appellant's continuing failure to produce the estate's financial records.

**22.** This figure appears to be slightly incorrect. The two figures on which the request for judgment was based, $10,600.00 and $3,968,- 13, add up to $14,568.13 (not $14,578.13). If this arithmetical error still needs to be corrected, that can be done on remand; see note 6, *supra*.

estate for several years beyond the approval date of the final accounting without reporting to the Court." Next, he pointed out that appellant had "breached his fiduciary responsibility by failing to complete the distributions as reflected in the final accounting." Finally, he maintained that appellant had mishandled the estate's assets, noting that appellant had "commingled estate assets via numerous transfers out of estate accounts into his own personal accounts," "misappropriated estate assets by transferring funds into his personal accounts," and "failed to turn over other assets in [a] Citibank CD account."[23] In response to Mr. Loewinger's motion, appellant filed on July 15, 2002, a Supplemental Statement of Account, attempting—apparently for the first time—to explain why some assets were missing. At a hearing the next day, July 16, the parties filed a praecipe in which appellant "concede[d] he withdrew $9,458.16 from the estate accounts without court approval."[24] Mr. Loewinger amended his motion to seek that amount, plus interest.

On August 2 the court entered an order directing appellant "to show cause ... why judgment for $9,458.16, plus $1,702.47 interest at 6 percent interest per annum from March 31, 1999, should not be entered against" appellant and his surety. Appellant filed a response to the court's order, to which he attached a copy of the letter that he had previously sent to the heirs.[25] In that response he made four arguments: (1) that the additional fee was permissibly taken pursuant to an assignment from some of the heirs, (2) that D.C.Code § 20–751 (1989) did not apply because the heirs had a right to make a side agreement for fees under *In re Evans*, 578 A.2d 1141 (D.C.1990), (3) that Mr. Loewinger, as the second successor personal representative, lacked standing to object to the side agreement,[26] and (4) that any interest should be computed from the actual date of each of the withdrawals, not from a single date.[27]

Loewinger replied to appellant's arguments, asserting (1) that appellant had made "secret" side agreements with some of the heirs, (2) that appellant's suppression of documents had caused the estate to incur extra expenses, (3) that "[t]hose [heirs] that did not consent to the agreements did not receive distributions from the estate until long after [appellant] was

---

**23.** Contrary to appellant's assertion, Mr. Loewinger did not seek judgment based on the side agreement. Although Loewinger did state in his recitation of the facts that "[t]he interested persons ... were not legally capable to approve or compromise the alleged fee claim with the personal representative, as court approval was required," he did not then object to the side agreement. This statement appears in Loewinger's discussion of appellant's motion to dismiss his earlier appeal, No. 99–PR–239, in which appellant informed this court that he had "resolved" the issues which prompted the appeal "with most of the interested persons of the estate...." It does not appear that Mr. Loewinger was aware of the side agreement at this time; his motion did not even mention it.

**24.** Appellant also "contend[ed] he had the right to compromise the fee claim with

heirs." However, he did not mention that there was in fact a side agreement.

**25.** This appears to be the first time that appellant disclosed the letter to the court and to Mr. Loewinger.

**26.** But see note 23, *supra*.

**27.** Appellant asserted that the court should not use March 31, 1999, as the date from which to calculate interest, because the sum of $9,458.16 that Loewinger was seeking had been taken from the estate on three separate dates: $458.16 on March 2, 1999, $2,000.00 on September 15, 1999, and $7,000.00 on October 12, 1999. Appellant maintained that interest should be calculated separately on these withdrawals, according to the date on which each sum was withdrawn.

removed as Personal Representative," [28] and (4) that appellant had taken money from the estate without prior court approval, because his " 'side agreements' called for his share to be pulled from the assets prior to the distribution of the remainder to the heirs." [29] Loewinger also contended that appellant had violated Rule 7.1 of the District of Columbia Rules of Professional Conduct.[30]

On January 30, 2003, the court entered judgment against appellant and his surety for $9,458.16, plus $1,702.47 in interest at 6 percent per annum from March 31, 1999,[31] and in addition for fees and costs incurred by Mr. Loewinger as successor personal representative. The court also ordered appellant to be removed from the fiduciary list, and again referred the matter to Bar Counsel. The court gave three reasons for its ruling. First, the court stated that although "[i]t has long been recognized that the distributees of an estate may make arrangements with the Personal Representative for the payment of his fee with their funds," [32] appellant's "representations to the beneficiaries in his letter requesting fees ... were not accurate" and that he had "effectively coerced each beneficiary into accepting a reduced share." The court also relied on the fact that appellant "concealed the existence of the side agreement from [Mr. Loewinger] and the

Court for more than two years," and that he "never filed an amended final account advising the Court of the true amount he paid each heir and never filed receipts."

Second, the court found that appellant had "suppressed subpoenaed documents resulting in unnecessary expenses to the Estate." Although Mr. Loewinger had made "numerous attempts" to obtain documents relating to the estate from appellant, the court said that appellant had "failed to provide bank statements, canceled checks, the compromise agreements, and other data or information which would assist [Mr. Loewinger] in determining the financial history of the estate." The court went on to say that "[a]s removed Personal Representative, Mr. Pye had a duty to forward all documents concerning the estate to the successor Personal Representative," and that his "extreme delay in providing documents and, in some cases, failure to provide documents ... resulted in an extra expense and delay to the estate."

Finally, the court declared that "prejudgment interest must be awarded under D.C.Code § 15–108 in this case because there is a liquidated amount and this case is principally equal to other cases where pre-judgment interest is awarded." The court reasoned that "the estate lost the use

**28.** Loewinger added that appellant "never distributed the monies to the beneficiaries that did not consent" and that he himself "made the distributions to those heirs."

**29.** There is no documentation in the record indicating how and when appellant received the additional fee from the heirs. Although the record does show that appellant distributed reduced shares to some of the heirs from the estate's Citibank checking account, it is not clear whether the heirs paid appellant his additional fee after they received their shares or whether he took his additional fee directly from the estate's assets.

**30.** We do not address the last of these arguments in this opinion because the present appeal does not involve any disciplinary issues.

**31.** Despite stating that interest should be calculated from March 31, 1999, the court made a specific finding of fact that the funds taken by appellant were withdrawn on three different dates. See note 27, *supra*.

**32.** The court cited *In re Evans*, 578 A.2d at 1142–1143, as support for its statement that side agreements are allowed. But see note 33, *infra*.

of funds and will not be fully compensated unless prejudgment interest is awarded." In the course of its discussion, the court noted that "[i]n addition to liability that the trial court may impose, a personal representative is personally liable for any breach of his or her duty to interested persons." The court explained:

> Mr. Pye was Personal Representative of the Estate and in a fiduciary relationship with the Estate's beneficiaries. Therefore, Mr. Pye is in violation of his fiduciary duty to the estate, and the estate has been denied access to its funds. The Court finds the award of prejudgment interest appropriate in this case to fully restore the Estate.

> The Estate and the heirs of the Leroy Green estate were denied the full amount of the respective shares of the Estate that were due to them and they should be compensated for that loss. This loss was due to the removed Successor Personal Representative's wrongful withholding of their shares unless and until the heirs assigned a portion of their shares to him. Accordingly, for this reason the Court finds that judgment should be entered against Mr. Pye and his bonding company, and that the

judgment amount should include prejudgment interest.

From this judgment appellant and his sureties filed a timely notice of appeal.

## II

▉ Appellant's first argument on appeal is that he had a valid side agreement for an additional fee with seven heirs of the estate. We agree with the trial court that the agreement was invalid, but we reach that conclusion by a different route. In particular, we do not rely on *In re Evans*, as the trial court did.[33] *See, e.g., Prince v. United States*, 825 A.2d 928, 931 (D.C.2003) ("it has long been held that an appellate court may uphold a trial court decision for reasons other than those given by that court.... This principle can be traced back for several decades and is firmly established in our case law." (citations omitted)). The basic issue in this case, as in any probate case when it appears that the personal representative may have favored his own interests over those of the heirs of the estate, is whether appellant's actions in seeking an additional fee breached his fiduciary duty to act in the best interest of the heirs. We conclude that he did breach that duty, and for that reason we hold that the side agreement was invalid.[34]

33. The trial court based its decision on the elements of a side agreement as set forth in *In re Evans*. *Evans* was a professional responsibility case that involved misappropriation of estate funds in violation of a disciplinary rule, DR 9–103(A). To our opinion, which was only two pages long, we attached the report of the Board on Professional Responsibility as an appendix. *Evans*, 578 A.2d at 1143. Although the trial court in the instant case may have thought that the discussion of side agreements in *In re Evans* was ours, that discussion was actually part of the Board's report. *Id.* at 1147–1148 & 1150. While we did not specifically comment on the Board's discussion of side agreements, we stated at the start of our opinion in *Evans* that "[t]he Board set forth its findings, conclusions, and recommenda-

tion in a lucid and thorough report which we adopt and reproduce as an appendix hereto." *Id.* at 1142. Thus our reliance on the Board's report was at least, but no more than, an acknowledgment that side agreements do exist. We do not rely on *Evans* in any way in the present case, because we conclude that the main issue here is whether appellant breached his fiduciary duty to act in the best interest of the heirs. We leave for another day, and another case, any discussion of the specific requirements for a valid side agreement.

34. Although the trial court mentioned breach of duty in its discussion of pre-judgment interest, it did not rely on breach of duty as a basis for finding the side agreement invalid.

In the District of Columbia, "[a] personal representative owes a fiduciary duty to the estate and its beneficiaries." *In re Estate of Hines*, 715 A.2d 116, 119 (D.C.1998) (citation omitted); *see also* D.C.Code § 20–701(a) (1989) ("A personal representative is a fiduciary who ... is under a general duty to settle and distribute the estate of the decedent ... as would a prudent person in such matters"); *In re Uchendu*, 812 A.2d 933, 937 (D.C.2002) ("Personal representatives act in a fiduciary role to administer decedents' estates" (citing D.C.Code § 20–101(j) (2001)). An important aspect of a personal representative's fiduciary duty is that he must place the best interests of the heirs ahead of his own interests. *See Richardson v. Green*, 528 A.2d 429, 436 (D.C.1987) ("a personal representative's primary function is to distribute the estate in the most favorable manner for the benefit of the heirs"); D.C.Code § 20–701(a) (1989) ("Such representative shall use the authority conferred ... by the equitable principles generally applicable to fiduciaries, fairly considering the interests of all the interested persons and creditors"); *cf. Rearden v. Riggs Nat'l Bank*, 677 A.2d 1032, 1035 (D.C.1996) ("A trustee has the highest duty of loyalty to the beneficiaries of the trust that it administers" (citations omitted)); RESTATEMENT (SECOND) OF TRUSTS § 170(1) (1959) ("The trustee is under a duty to administer the trust solely in the interest of the beneficiaries").[35] Appellant breached his fiduciary duty to act in the best interests of the heirs, because the means that he employed to obtain an additional fee favored his own interests rather than theirs.

Appellant's actions in this case—asking for a stay, writing a letter to the heirs without the probate court's knowledge, violating the stay for those heirs who agreed to pay an additional fee, and initiating an appeal—show that he placed his interest in obtaining a larger fee before the best interests of the heirs. If appellant had simply sought a stay and then appealed, or if he had paid the lesser (undisputed) amount to all the heirs and held the remainder in escrow pending resolution of his claim, this would be a different case. But, in the time between obtaining the stay and noting an appeal, appellant sent a letter to the heirs telling them that if they did not pay the additional fee and accept reduced shares, he would "not be in a position to make a distribution ... until the Court of Appeals decides my appeal, which most probably will not be for at least another year."[36] After six of the heirs agreed, appellant noted an appeal. Several months later a seventh heir agreed, and appellant, while the appeal was still pending, distributed reduced shares to the seven heirs who agreed to pay an additional fee. He did not, howev-

---

**35.** *See also Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201, 1210 (D.C.2002) ("The directors' fiduciary obligation to a corporation means that they must manage the corporation solely in its best interest, not as a vehicle for promoting their personal beliefs or causes").

**36.** At no time during his tenure as personal representative did appellant inform the probate court that he had sent the letter to the heirs or that he had entered into a side agreement with some of them. The record reveals that it was only when Mr. Loewinger filed his motion for entry of judgment that appellant raised the side agreement as a defense to that motion. Moreover, appellant did not submit the letter to the trial court until August 12, 2002, more than three years after he had entered into the agreement with the heirs. If the probate court had been aware that appellant was going to send such a letter and use the stay to pressure the heirs into paying him that portion of the fee which it had refused to approve, we think it likely that the court would have refused to grant the stay or would have taken some other action to protect the interests of the heirs.

er, make a distribution to the remaining heirs who did not agree to pay the additional fee even after the appeal was dismissed.

■ Given these facts, the conclusion is inescapable that appellant took advantage of the stay and the appellate process to further his own interest in obtaining a larger fee. By seeking the stay, he created a situation in which the heirs would have to wait to receive their shares of the estate, then used that situation as leverage to pressure them into paying him an additional fee and accepting reduced shares. As the trial court stated, appellant withheld the heirs' shares "unless and until the heirs assigned a portion of their shares to him." While a personal representative has a right to reasonable compensation for his services, *see* D.C.Code § 20–751(a) (1989), that right does not supersede the best interests of the heirs. What the Restatement of Trusts says about the fiduciary duty of a trustee applies with equal force to the situation presented here: the personal representative "is in a fiduciary relation to the [heirs] and as to matters within the scope of the relation he is under a duty not to profit at the expense of the [heirs]." RESTATEMENT § 170, comment a. We hold accordingly that the side agreement in this case is invalid because appellant breached his fiduciary duty to the heirs.

## III

■ Appellant's second contention is that the trial court erred in relying on his failure to turn over documents as "a basis for rescission of his fee assignment from the heirs." This argument is without merit. We agree with appellee Loewinger that appellant "misconstrues the Court's Order" because, as Mr. Loewinger states in his brief, "[a]t no place in the Court's Order does the Court take the position that the side agreement was invalid because Appellant failed to provide documents to the Second Successor Personal Representative." The court did refer to appellant's failure to turn over documents, but only as a basis for awarding fees and costs incurred by Mr. Loewinger, who was forced to reconstruct the financial records of the estate because of that failure.[37] On this point we find no error. *See* D.C.Code § 20–523(b) (1989).[38]

## IV

■ Appellant maintains that Mr. Loewinger, as second successor personal representative, had no standing to object to the side agreement "in the absence of any objection or complaint on the part of the [seven] participating heirs."[39] This argument fails for three reasons. First, and most importantly, the record discloses

---

**37.** We do not view the theft of appellant's file containing the financial records of the estate as a mitigating factor. After the theft, appellant could and should have attempted to reconstruct the records of the estate in the same way that Mr. Loewinger eventually did. *See* D.C.Code § 20–523(b) (1989).

**38.** D.C.Code § 20–523(b) provides in part:
Termination does not ... reduce the personal representative's duty to protect property subject to such representative's control, to account for such property and to deliver such property to the ... successor representative. ... If the personal representative

fails to account for and deliver the property belonging to the estate to the successor personal representative ... the Court may enter judgment against the personal representative and the personal representative's surety.
*See also In re Estate of King, supra* note 5, 769 A.2d at 778 ("it is legitimate to sanction a personal representative for actions which provide no benefit, and indeed are detrimental, to the estate").

**39.** Appellant raised this argument below, but it was not addressed by the trial court.

that Mr. Loewinger initially objected to appellant's handling of the estate because he discovered that there was a substantial discrepancy between the amount of assets shown in the Probate Division's Amended Second and Final Account and the assets that appellant turned over to him. It was only after appellant relied on the side agreement as a defense to the motion for entry of judgment that Loewinger learned of the side agreement and objected to it. Second, the Probate Code states that "[a] personal representative may at any time petition the Court for permission to act in *any matter relating to the administration of the estate.*" D.C.Code § 20–742(a) (1989) (emphasis added); *see also* D.C.Code § 20–107 (1989) ("An interested person . . . may, at any time, apply to the Court to resolve questions concerning the estate or its administration"); D.C.Code § 20–101(d)(1)(B) (1989) (defining "interested person" to include a personal representative). Missing assets and a side agreement with some of the heirs for an additional fee are plainly matters that are related to the administration of the estate. Finally, this court has explicitly recognized that "[t]he personal representative has a duty to take possession and control of the decedent's estate and to maintain any action reasonably necessary . . . to recover possession of estate property." *Rearden,* 677 A.2d at 1038 (citation omitted); *see also* D.C.Code § 20–702 (1989) ("The personal representative may maintain an action to recover possession of any property of the estate"). In *Rearden* we said that if

a successor personal representative has knowledge that his predecessor breached his fiduciary duty, the successor "would be obligated to pursue any such claim known to it on behalf of the probate estate." 677 A.2d at 1038 (footnote omitted). Therefore, although Mr. Loewinger was not a party to the side agreement, we hold that he had standing as successor personal representative to seek a judgment against appellant.

V

■■ Appellant's final claim of error concerns the trial court's award of pre-judgment interest. D.C.Code § 15–108 (2001) states:

In an action . . . to recover a liquidated debt on which interest is payable by contract or by law or usage, the judgment for the plaintiff shall include interest on the principal debt from the time when it was due and payable, at the rate fixed by the contract, if any, until paid.[40]

*See also, e.g., District Cablevision Limited Partnership v. Bassin,* 828 A.2d 714, 731 (D.C.2003) ("By the terms of D.C.Code § 15–108, the judgment for the plaintiff 'shall' include pre-judgment interest if: (1) the action is one to recover a liquidated debt, and (2) interest is payable on that debt by contract or by law or usage"). "A liquidated debt is one which at the time it arose . . . was an easily ascertainable sum certain." *Schwartz v. Swartz,* 723 A.2d 841, 843 (D.C.1998); *see also, e.g., Pierce*

---

40. In this case, because there is no "rate fixed by the contract" (indeed, there is no contract at issue), the rate of interest is 6 percent. "[W]hen the rate of interest has not been specified in the contract, courts in this jurisdiction have without exception limited it to the statutory rate provided in D.C.Code § 28–3302." *District of Columbia v. Pierce Associates, Inc.,* 527 A.2d 306, 310 (D.C.1987) (citations omitted). Section 28–3302(a) (2001)

provides that "[t]he rate of interest in the District upon the loan or forbearance of money . . . in the absence of expressed contract, is 6% per annum." In his initial brief, appellant challenged the application of section 28–3302(a). However, in his reply brief, he "agrees that the statutory rate of interest is 6% under D.C.Code § 28–3302(a) that applies 'in the absence of expressed contract.'"

*Associates,* 527 A.2d at 311. The amount that appellant took from the estate is a liquidated debt because appellant stipulated that he withdrew "$9,458.16 from the estate accounts without court approval." The first requirement of section 15–108 is thus satisfied. Appellant, however, questions both the applicability of section 15–108 based on "usage" and the date that the trial court used as a starting point for its calculation of pre-judgment interest.

▬ Appellant contends that "[t]here is no 'usage' existing in the Probate Division that pre-judgment interest must be added to all judgments entered against fiduciaries and their sureties." This "usage" argument, as we understand it, construes section 15–108 too narrowly. Appellant seems to equate "usage" with a requirement that there be a history of requiring the payment of pre-judgment interest in the Probate Division. Section 15–108, however, suggests that "usage," at least in a case like this, refers simply to whether the funds that were removed from the estate would have accrued interest had they been left in place. *See In re Estate of Greene,* 851 A.2d 418, 425 (D.C.2004) ("as a matter of law, the guardian should be obliged to pay interest for improper use of the money during a period when that money should have remained in the estate earning income for the ward"). In this case, it cannot be seriously questioned that the funds which appellant took from the estate would have been accruing interest (or some other type of income, such as dividends) had they remained in the estate's account. That is enough to meet the "usage" requirement, and thus "pre-judgment interest is mandatory." *District Cablevision,* 828 A.2d at 731.

▬ The particular sum awarded, however, raises a separate question. Appellant asserts that "pre-judgment interest should be calculated by applying the interest rate to each of the three withdrawals from the date each of them was withdrawn from the Estate account." On this point we agree with appellant. "[S]ection 15–108 'mandates pre-judgment interest for liquidated debts from the date the debt is due until the date it is paid.'" *Nolen v. District of Columbia,* 726 A.2d 182, 184 (D.C.1999) (quoting *Pierce Associates,* 527 A.2d at 310). The trial court calculated pre-judgment interest from March 31, 1999. This was error, however, because the court specifically found that the funds that appellant took from the estate were withdrawn on three different dates other than March 31.[41] The court should therefore have calculated pre-judgment interest separately for each of the three withdrawals, from the date on which each of those withdrawals was made.

## VI

For the foregoing reasons, we affirm the trial court's decision to enter judgment against appellant. We hold that the trial court did not abuse its discretion in ruling against him on the merits. *See In re Travers, supra* note 5, 764 A.2d at 254 ("the trial court did not abuse its discretion in entering judgment against [a lawyer] for the $3,562.74 he received in fees from the estate"). We remand the case, however, so that the trial court may recalculate the pre-judgment interest in accordance with the last paragraph of part V of this opinion.

*Affirmed in part, and remanded for further proceedings.*

---

**41.** The court found that the funds taken out of the estate by appellant were withdrawn in three separate amounts: (1) $458.16 on March 2, 1999, (2) $2,000.00 on September 15, 1999, and (3) $7,000.00 on October 12, 1999.